IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






No. PD-0323-05






NATHAN ANDREW KNIATT, Appellant



v.



THE STATE OF TEXAS





ON THE STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TENTH COURT OF APPEALS


ELLIS COUNTY






 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J., and Johnson,
Keasler, Hervey, and Cochran, JJ., joined. Keller, P.J., also filed a concurring
opinion. Meyers, J., did not participate. Womack, J., concurred in the result. 



 The Tenth Court of Appeals "found" that appellant had "met his burden of showing . . . that
his guilty plea [had been] involuntarily given," and ordered the trial court to grant appellant the
habeas relief that he had requested. Kniatt v. State, 157 S.W.3d 83, 87 (Tex.App.-Waco 2005). We
reverse and remand.

 The relevant, undisputed facts, as reflected in the record, are as follows. On June 10, 2001,
law enforcement officials in Ellis County searched appellant's person without a warrant, found 
methamphetamine, and then arrested him for possession of that methamphetamine. The officials 
then placed appellant in the Ellis County Jail, where he stayed until released on bond about a week
later.

 On August 22, 2001, an Ellis County grand jury returned an indictment charging appellant
with felony possession of less than one gram of methamphetamine. See Tex. Health & Safety Code
§ 481.115(a) & (b).

 On December 7, 2001, the trial court held a pretrial hearing in this case. At that hearing,
appellant's trial counsel, Ted Redington, and the assistant district attorney, Patrick Wilson, both
informed the trial court that appellant had decided to reject a plea bargain to which he had previously
agreed. Redington also informed the trial court that appellant had decided to retain different counsel. 
The trial court, speaking for the record and to appellant, responded as follows:

 "All right. State versus Nathan Kniatt, set for trial on Monday [December 10,
2001]. As I understand from the attorneys, they thought they had a plea agreement. 
In fact, they did have a plea agreement, and today the defendant has reneged on that,
doesn't want the agreement.

 "I've also been informed he wants to fire his lawyer. All that's okay with me. 
I'll take all this up. Defendant's bond is revoked. He's going to jail pending trial.[ (1)]

 "Have a seat over there, sir. We'll set your trial when we get around to it."

 

 On December 11, 2001, appellant, accompanied by Redington, returned to court and entered
a guilty plea pursuant to a plea bargain substantially similar to the one he had rejected previously. 
Appellant, who was eighteen years old at that time and of sound mind and average intelligence,
swore under oath that his guilty plea was being entered "freely and voluntarily." The trial court, in
accordance with the terms of the plea bargain, deferred an adjudication of appellant's guilt, placed
him on community supervision for three years, and fined him $3,000.

 On February 23, 2003, the State filed a motion to proceed with an adjudication of guilt. In
its motion, the State alleged that appellant had violated several of the conditions of his community
supervision.

 On April 3, 2003, appellant filed a pre-conviction application for writ of habeas corpus,
pursuant to Article 11.08 of the Texas Code of Criminal Procedure, and a motion to recuse the trial
court judge from hearing that application or from hearing the State's motion to proceed with an
adjudication of guilt. In his application, appellant alleged that his December 7, 2001, guilty plea had
been entered "involuntarily." In his brief accompanying his application, appellant argued that "the
trial court's [unlawful] action in [revoking his bond] and remanding [him] into the custody of the
Ellis County Sheriff [to await] trial [coerced him and] rendered [his] subsequent plea involuntary." 
Appellant also argued that "the statements and actions of his former counsel, Redington, as well as
those of Assistant District Attorney Wilson, operated to coerce [him into an] involuntary plea."

 On April 28, 2003, an assigned judge held an evidentiary hearing on appellant's motion to
recuse and denied it.

 On June 4, 2003, the trial court held an evidentiary hearing on both the State's motion to
proceed with an adjudication of guilt and appellant's application for writ of habeas corpus. (2) Midway
through the hearing, the State asked that "the writ portion of [the] hearing" be postponed to a later
date, so that the State would have more time in which to locate one of its witnesses. The trial court
granted the State's request. At the conclusion of the hearing, the trial court also granted the State's
motion to proceed with an adjudication of guilt, and then adjudicated appellant guilty of the primary
offense. The court assessed appellant's punishment at incarceration for 200 days and a $3,000 fine.

 On June 13, 2003, the trial court held an evidentiary hearing on appellant's application for
writ of habeas corpus. At that hearing, the trial court received the testimony of four witnesses:
appellant; appellant's father, Paul Kniatt; Redington; and Wilson. (3) Appellant testified that (1) 
immediately before the pretrial hearing on December 7, 2001, Wilson had "threatened" him "that
if [he] didn't take the plea bargain on that day, that they wouldn't offer it again and they would give
[him] the maximum sentence;" (2) contrary to what Redington and Wilson had told the trial court
on December 7, 2001, he had never agreed to a plea bargain until shortly before his guilty plea on
December 11, 2001; and (3) he had agreed to the plea bargain on December 11, 2001, only because
he "didn't want to sit in jail without a bond for who knows how long."

 Appellant's father, Paul Kniatt, testified that immediately before the pretrial hearing on
December 7, 2001, he had heard Redington warn appellant that if he rejected the plea bargain, "the
judge was going to put him in jail."

 Redington testified that (1) in late November 2001, he had met with appellant and had
discussed with him all of his options, including the State's offer of a plea bargain involving deferred
adjudication; (2) he had advised appellant "that a plea would probably be in his best interest,"
because appellant's only possible defense was an "arguable" motion to suppress; (3) appellant had
telephoned him a few days after their November meeting and had accepted the State's offer; (4)
immediately before the pretrial hearing on December 7, 2001, appellant "came [in] with his dad, and
. . . they were both in kind of a tizzy and talking about not wanting the plea bargain anymore;" (5)
he had advised appellant at that time that if he reneged on the plea bargain, the trial court might
revoke his bond and put him in jail to await trial; (6) sometime after the pretrial hearing on
December 7, 2001, appellant's stepmother had telephoned him to relate that appellant had decided
to accept the State's plea bargain offer after all; (7) neither he (i.e., Redington) nor Wilson had ever
tried to coerce appellant into accepting the plea bargain offer; and (8) appellant had never told him
that he was pleading guilty because it was his only way to get out of jail. Redington's testimony
continued:

 Q [by defense counsel]: Knowing this defendant and your interaction with him, 18-year-old young man, as to him particularly, did what [the trial court] did [i.e.,
revoking appellant's bond], was it likely to cause, likely to interfere with him
completely exercising his own volition freely and voluntarily [on December 11,
2001] as to whether or not to take that plea [bargain offer]?

 

 * * *



 A: I don't think so.

 

 Q: And can you give the reasons why you think that would have no effect on
someone's decision whether to plead or not?

 

 A: Because we had a thorough and complete discussion about all of his options ten
days before. And on the basis of that thorough discussion, he made the free and
independent choice to accept the plea bargain. It wasn't until his dad came in with
him [on December 7, 2001] that his judgment seemed to be affected. I think rather
than - I don't think it was the jail that caused him to change his mind.

 

 Q: Well, he changed his mind in between . . . the moment his bond was revoked and
when he came back, didn't it? Okay. Prior to his bond being revoked, he didn't want
to take the plea; will you agree with me on that? He refused?

 

 A: Well, I don't know. Before [December 7, 2001] he did want to take the plea. Ten
days ago he was more than happy to take the plea.


 Q: I'm talking about on December 7th.


 A: He comes in with a whole new idea with his dad.

 

 * * *


 

 Q: What happened between the time that the judge revoked his bond, since you didn't
go see him [in the jail], and the time that he came into court on Tuesday [December
11, 2001] that would have caused the taint of what had occurred on the 7th to
dissipate?

 

 A: Cool reflection perhaps on what was in his best interest.


 Finally, Wilson testified in relevant part that he had never threatened or coerced appellant
in any way.

 At the close of the evidence at the June 13, 2003, habeas hearing, appellant argued that he
had proved by a preponderance of the evidence that his guilty plea had been entered involuntarily. 
More specifically, appellant argued that he had proved that on December 11, 2001, "he [had]
reasonably felt that he was coerced and that his only avenue to get out of jail was to waive his right
to trial by jury and . . . accept the plea bargain." Appellant argued further that he had proved that,
in pleading guilty, he had "acquiesc[ed] to what he [had] perceived to be actions by this court, by
his own attorney, as well as the prosecution to coerce him into accepting that plea agreement." As
for the relief sought, appellant asked the trial court to set aside both the order placing him on
deferred adjudication and the subsequent judgment of conviction. 

 On June 19, 2003, the trial court issued an order denying appellant's request for habeas
corpus relief. Also on June 19, 2003, the trial court issued findings of fact in which it found that,
on December 7, 2001, appellant had in fact reneged on a plea bargain, as Redington had claimed. 
The trial court also admitted in its findings of fact that it had "sanctioned" appellant, by revoking his
bond, for his decisions to renege on the plea bargain and replace his counsel.

 Appellant appealed from both the trial court's order denying his request for habeas corpus
relief and the visiting judge's order denying his motion to recuse. With respect to the trial court's
order denying his request for habeas corpus relief, appellant argued that the trial court had erred in
rejecting the legal and factual arguments he had made in that court.

 The Tenth Court of Appeals granted appellant relief on his habeas claim and did not reach
his recusal claim. The court of appeals explained its decision as follows:

 "Kniatt argues that the trial court erred in denying his application for writ of
habeas corpus on the grounds that his plea on December 11, 2001, was not
voluntarily given. . . .

 * * *


 "Kniatt contends that the statements and actions of his former counsel
[Redington], the assistant district attorney [Wilson], and the trial court operated to
render his plea involuntary. . . .

 * * *


 "Kniatt contends that the trial court's action in revoking his bond and
ordering him held without bond pending trial constituted an unconstitutional
punishment in violation of the Due Process Clause of the Fourteenth Amendment of
the United States Constitution. . . . Kniatt argues that the trial court's action was
intended to coerce him to plead guilty and punish him for exercising his right to trial
by jury.

 "In its findings of fact on the habeas application, the trial court acknowledged
that it 'sanctioned' Kniatt by revoking his bond and remanding him to jail in response
to his decision to renege on the plea bargain and replace his counsel. . . . 

 "The record supports Kniatt's contention that the trial court improperly
revoked his bond. However, Kniatt must also show that the trial court's action
pressured him to plead guilty. Our review of the record persuades us that a person
in Kniatt's position would have reasonably believed that his incarceration was the
result of his decision not to plead guilty. At the hearing on Kniatt's motion to recuse,
Redington testified that he had told Kniatt that if he did not plead guilty the judge
was likely to send him to jail to await a trial date. Kniatt testified that he subjectively
felt pressured to change his plea and enter a plea of guilty. He testified that the
reason he changed his mind between December 7 and December 11 was because he
did not want to 'sit in jail without a bond for who knows how long.' At the time
Kniatt entered his plea, he had been in jail for four days and did not know when his
case would be set for trial. 

 * * *


 "We find that Kniatt has met his burden of showing by a preponderance of
the evidence that his guilty plea was involuntarily given. We find that the trial court
erred in denying Kniatt's application for writ of habeas corpus. Accordingly, we
sustain that issue. Having sustained this issue, we need not address Kniatt's
additional issue arguing that the [assigned judge] erred in denying his motion to
recuse the trial judge from considering the motion to adjudicate and the habeas
application.

 "We reverse the trial court's denial of Kniatt's application for a writ of habeas
corpus and remand to the trial court to grant Kniatt relief consistent with this opinion. 
We order the trial court to set aside the judgment adjudicating guilt and proceed with
a new trial."


Kniatt v. State, 157 S.W.3d at 85-87.

 The State subsequently filed a petition for discretionary review, in which it puts forth two
grounds for review. In its first ground, the State argues that the court of appeals lacked jurisdiction
to review the trial court's ruling on appellant's application for writ of habeas corpus, because the trial
court itself, at the time it heard the application, lacked jurisdiction to hear it. The trial court lacked
jurisdiction to hear the application, the State's argument continues, because the trial court had
already adjudicated appellant guilty by the time it heard his application. In its second ground for
review, the State argues that the court of appeals erred in reversing the trial court's ruling on
appellant's application for writ of habeas corpus because the court of appeals used an incorrect, de
novo standard of review rather than the correct, abuse-of-discretion standard of review.

 We granted the State's petition to consider these two grounds for review. See Tex. R. App.
Proc. 66.3(e). We turn first to the State's first ground, relating to the lower courts' jurisdiction. At
the time appellant filed his application for writ of habeas corpus, it was a pre-conviction application,
and, pursuant to Article 11.08, the trial court had jurisdiction to hear it. Did the trial court lose
jurisdiction to hear appellant's application once that court adjudicated him guilty?

 In Ex parte Johnson, 12 S.W.3d 472 (Tex.Crim.App. 2000), Mark Anthony Johnson filed
a post-conviction application for writ of habeas corpus while his direct appeal was still pending and,
therefore, before his conviction became final. Under Article 11.07, this Court has no jurisdiction
to consider post-conviction applications until the underlying convictions become final. We
dismissed Johnson's application for lack of jurisdiction, even though by the time we dismissed the
application his conviction had become final, "because the application . . . was filed during the
pendency of the direct appeal." 12 S.W.3d at 473. We thus held, in effect, that the jurisdiction of
a court to consider an application for writ of habeas corpus is determined at the time the application
is filed. We adhere to that holding today and hold that the trial court in this case did not lose
jurisdiction to hear appellant's pre-conviction application once that court adjudicated him guilty. 
We overrule the State's first ground for review.

 We turn next to the State's second ground for review, relating to the court of appeals'
standard of review. A guilty plea constitutes a waiver of three constitutional rights: the right to a jury
trial, the right to confront one's accusers, and the right not to incriminate oneself. Boykin v.
Alabama, 395 U.S. 238, 243 (1969). Accordingly, a guilty plea, to be consistent with due process
of law, must be entered knowingly, intelligently, and voluntarily. Id. at 242; McCarthy v. United
States, 394 U.S. 459, 466 (1969). To be "voluntary," a guilty plea must be the expression of the
defendant's own free will and must not be induced by threats, misrepresentations, or improper
promises. Brady v. United States, 397 U.S. 742, 755 (1970). A defendant's sworn representation
that his guilty plea is voluntary "constitute[s] a formidable barrier in any subsequent collateral
proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). 

 An applicant seeking habeas corpus relief on the basis of an involuntary guilty plea must
prove his claim by a preponderance of the evidence. Ex parte Morrow, 952 S.W.2d 530, 535
(Tex.Crim.App. 1997). An applicant's delay in seeking habeas corpus relief may prejudice the
credibility of his claim. Ex parte Young, 479 S.W.2d 45, 46 (Tex.Crim.App. 1972). An appellate
court reviewing a trial court's ruling on a habeas claim must review the record evidence in the light
most favorable to the trial court's ruling and must uphold that ruling absent an abuse of discretion. 
Ex parte Peterson, 117 S.W.3d 804, 819 (Tex.Crim.App. 2003).

 Given the record evidence in this case, especially Redington's testimony, the trial court could
have reasonably concluded that appellant had accepted the State's offer of a plea bargain and had
pled guilty on December 11, 2001, not because the trial court had punished him by revoking his bond
and putting him in jail to await trial, but because he had reasonably concluded that it was in his best
interest to accept the plea bargain and take deferred adjudication community supervision and a
modest fine. That is to say, on this record the trial court could have reasonably concluded that (1)
in late November 2001, Redington had advised appellant that it was probably in his best interest to
accept the State's offer of a plea bargain; (2) appellant had initially agreed to the plea bargain but
had later changed his mind, probably because of his father's influence; (3) sometime between
December 7, 2001, and December 11, 2001, appellant had decided to accept the State's offer of a
plea bargain after all; (4) appellant had later filed an application for writ of habeas corpus, not
because his guilty plea had been involuntary but because he had wanted to avoid the consequences
of his failure to abide by the terms of his community supervision; (5) appellant had been sincere
when, on December 11, 2001, he had sworn that his guilty plea was voluntary; and (6) appellant had
decided later that he had pled guilty only because he "didn't want to sit in jail without a bond for
who knows how long." 

 We note that the record contains no evidence that appellant, at the time he pled guilty, was
so gripped by fear of incarceration that, even with the assistance of counsel, he could not rationally
weigh the advantages of pleading guilty against the disadvantages of going to trial. We also note that
the trial court could believe or disbelieve any of the witnesses and could properly take into account
the fact that appellant made no claim of an involuntary plea until after the State filed its motion to
proceed to an adjudication of guilt.

 In summary, we discern no abuse of discretion on the part of the trial court. Given the record
evidence, the trial court could have reasonably concluded that appellant had entered his guilty plea
voluntarily, i.e., that appellant's guilty plea had not been induced by threats, misrepresentations, or
improper promises, and the court of appeals erred in holding otherwise. We sustain the State's
second ground for review.

 We reverse the judgment of the court of appeals and remand the case to that court so that it
may consider appellant's remaining claim.


DELIVERED JUNE 20, 2006

PUBLISH
1. The trial court's revocation of appellant's bond was plainly unlawful. As Professors
Dix and Dawson have observed, "Texas law confers no general power upon judges . . . to revoke
bail and regard the revocation as rendering a defendant nonbailable." G. Dix & R. Dawson, 41
Tex. Prac. Series, Criminal Practice and Procedure § 16.152 (2d ed. 2001).
2. A trial court may properly consider, in a single hearing, both a motion to proceed with
an adjudication of guilt and an application for writ of habeas corpus. See Jordan v. State, 54
S.W.3d 783, 786 (Tex.Crim.App. 2001).
3. Two of the witnesses (appellant and his father) testified in person at the June 13, 2003,
habeas hearing. The other two witnesses (Redington and Wilson) testified in person at the April
28, 2003, recusal hearing, but their testimony at the recusal hearing was admitted for all purposes
at the habeas hearing.